**William THOMAS, et al., Plaintiffs,**

**v.**

**NETWORK SOLUTIONS, INC., and National Science Foundation Defendants.**

**No. CIV. 97–2412(TFH).**

United States District Court, District of Columbia.

April 6, 1998.

William Herbert Bode, Wm. H. Bode & Associates, Washington, DC, for Plaintiffs.

Michael Leonard Burack, Gary Dean Wilson, Wilmer, Cutler & Pickering, Washington, DC, for Defendant Network Solutions.

Madelyn E. Johnson, Suzanne C. Nyland, U.S. Attorney's Office, Washington, DC, for Defendant National Science Foundation.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Pending before the Court are three motions: plaintiffs' motion for summary judgment on Counts One and Three of the Amended Complaint, plaintiffs' motion for a preliminary injunction, and defendants' motion to dismiss the entire Amended Complaint. The Court held a hearing on these motions on March 17, 1998. After consideration of the parties' briefs and arguments at that hearing, the Court will grant plaintiffs' motion for summary judgment on Count One; at this time, however, the Court will grant judgment only on the issue of liability, and will reserve judgment on the issue of damages and other relief until it has ruled on plaintiffs' motion for class certification. The Court will deny plaintiffs' motion for judgment on Count Three, and will grant defendants' motion to dismiss as to all counts of the Amended Complaint, except Count One. The Court will deny plaintiffs' motion for a preliminary injunction, and will dismiss all counts of the Amended Complaint, except Count One.

## I Background

### A. The Parties

Defendant National Science Foundation ("NSF") is an independent agency of the United States government, organized pursuant to a federal statute. 42 U.S.C. § 1861. NSF's primary function is to support and strengthen scientific research, engineering, and educational activity. 42 U.S.C. § 1862(a)(1). With the passage of the Scientific and Advanced Technology Act in 1992, NSF received an expanded mandate to support development of the Internet and to facilitate its use. See 42 U.S.C. § 1862(g).

Defendant Network Solutions, Inc. ("NSI") is a private company that has been engaged in the registration of domain names since 1991. In 1991, NSI won a subcontract to a procurement contract that Government Services, Inc. (GSI) had been awarded by the Defense Information Services Agency. NSI's duties under that subcontract were to perform domain name registrations and to assign Internet Protocol (IP) numbers. In 1992, NSI entered into a cooperative agreement with NSF to perform essentially the same functions. Under the terms of that agreement, which is scheduled to expire later this year, NSI manages and maintains the registry of domain names.

There are nine plaintiffs—three individuals and six corporations. Plaintiffs each allege that they have paid fees to NSI for the right to register domain names for use on the Internet.

### B. The Internet and Domain Name System

The Internet is a complex network that links computers worldwide. It is the outgrowth of a system known as ARPANET, a network that the military created in 1969 to link its computers with those of defense contractors and universities. See generally, Reno v. ACLU, —— U.S. ——, ——, 117 S.Ct. 2329, 2334, 138 L.Ed.2d 874 (1997). While that network no longer exists, it provided a model for a number of similar, civil-

ian networks that eventually coalesced into the backbone of the modern Internet.

Use of the Internet has grown exponentially over the past eighteen years. In 1981, an estimated 300 computers were linked via these networks; by 1996, the number had risen to an estimated 9.4 million computers, and some experts believe that 200 million persons will use the Internet by 1999. Nearly 60% of the computers currently linked to the Internet are located in the United States.

In order to fully access the Internet, a user needs a unique address, called an "Internet Protocol," or "IP," address. It is from this address that a user may post information, access information at other addresses, or exchange information with another user. IP addresses are composed of a long string of numbers; because of this, however, they are themselves rarely memorable. In order to smooth the transfer of information, a user will often attach an alphanumeric "domain name" to his or her IP address.

Domain names consist of a series of letters or numbers, followed by a period and a specific three letter designation. The series of letters and numbers to the left of the period is called the "second level domain name," and it is unique to the individual user. This name can be tailored to be easily remembered, and even to convey information about the user—it is often descriptive, catchy, and occasionally clever. In the United States, the three letter designation to the right of the period is one of seven handles: "gov," "org," "com," "net," "edu," "mil," or "int."[1] These seven handles are called "top level domain names."

It is clear that domain names make the Internet much more accessible. Instead of seeking information at a site designated only by a random number, the user can access a site by its descriptive name. If the name is properly registered and linked to an IP address, the user will be conveyed to the site he or she seeks.

The key, of course, is that the name and the IP address must be linked together. In order to prevent confusion—two users with the same name, for example—users must register their second level names with one of the seven top level names. Although there has been discussion of competition in the registration of domain names, at this time a user may register in a top level domain name only through defendants.[2]

### C. Solicitation and Award of Cooperative Agreement to NSI

Before 1992, NSF performed many administrative tasks in regard to the non-military aspect of the nascent Internet. Among these tasks was the registration of domain names and the maintenance of the registry of names. However, in March 1992, NSF issued Solicitation 92–24 for a Network Information Services Manager for the Internet. NSF considered proposals from three firms that wished to assume the task of providing registration services for the non-military component of the Internet.

NSF chose NSI, and on January 3, 1993, the two entered into Cooperative Agreement No. NCR–9218742. The contract specified that, after a three month "phase-in" period, NSI would provide registration services for five years, with a six month "flexibility period" at the end. Therefore, the cooperative agreement that became effective on January 1, 1993, was due to expire on March 31, 1998, and has a flexibility period that will expire on September 30, 1998.

---

1. There are more top-level names in foreign countries, where domain names may also be followed by a two letter country code, such as "fr" in France.

2. A user can gain access to the Internet without registering a top level name, by seeking access through a company that already has a top level name. In this case, the user's domain name consists of a unique name, followed by the "@" symbol, followed by the company's second and top level designations. According to the infor-

mation before the Court, most users see no noticeable difference in either method. Having one's own top level name is similar to receiving mail at a unique address, such as a house, and going through another's top level name is like receiving mail at a private part of a shared address, such as a post box in an apartment building. However, some users do have plans for which this method is insufficient; those users require a top level name, and must register with defendants to obtain it.

The original contract called for NSI to operate on a "cost-plus-fee" basis, meaning that NSI received reimbursement for its costs, plus a fixed fee that ensured the company's profit. Under this original contract, the costs and fees were paid by NSF out of its operating budget; users did not have to pay fees to register or to maintain domain names. The contract estimated that, over the five year life of the agreement, NSI would receive $4,854,061 in cost reimbursement and $365,278 in fixed fee profit. *See* Cooperative Agreement at Art. 8, ¶ A.

### D. Amendment of Cooperative Agreement

The original agreement provided that changes may eventually be made; among these contemplated changes was "the imposition of a user based fee structure." *Id.* at Art. 3, ¶ G. The contract provided that the fee structure could be re-assessed through peer review at any time before December 31, 1994. *Id.* at Art. 5, ¶ B. An independent panel (allegedly with no representatives of NSI or NSF) began its review in late 1994; in March 1995, NSI proposed to charge prospective users for registration.

On September 13, 1995, NSF and NSI entered into Amendment 4 of the Cooperative Agreement. This amendment eliminated the "cost-plus-fee" method of compensation. In its place, it permitted NSI to charge fees for the registration and maintenance of domain names, which meant that, for the first time, users had to pay to register and maintain their domain names. The amendment set the fees at $100 to register and at $50 to renew annually.[3] Since 1995, NSI has been solely responsible for collecting these fees.

The amendment does not permit NSI to keep the entire fee as reimbursement for costs and profit. Instead, NSI keeps 70% of each fee for itself and places the remaining 30%[4] into the Intellectual Infrastructure Fund. The 30% contribution is commonly known as the "Preservation Assessment." NSI is responsible for maintaining the Fund, but the government directs the expenditure of monies from the Fund.

### E. NSI's Experience Under the Cooperative Agreement

The Internet landscape is substantially different in 1998 than it was in 1993, when NSI and NSF entered into their cooperative agreement. In 1992, NSF and NSI estimated that the latter would perform about 229 new registrations per month. That estimate quickly became outdated. In March of 1994, NSI was performing 1,376 new registrations per month. In December 1994, it performed 3,164, and in April 1995, the number was 9,774. NSI estimates that, by late 1997, it was handling 120,000 new registrations per month, and it had registered a total of 2,269,-751 domain names, including 1,957,239 in the ".com" top level domain.

Given the fee structure in place after September 1995, NSI clearly had substantial receipts for its efforts. The parties disagree to some extent about the exact amount of receipts, and the parties disagree as to NSI's profit margins. Plaintiffs allege that NSF gave NSI all its hardware and software free of charge. Plaintiffs further allege that NSI's per registration cost is approximately $10, and that it does not exceed $20 in any case.[5] Therefore, argue plaintiffs, NSI has amassed $89.7 million in above cost profit in just under five years.[6]

---

3. The fee for initial registration also covered the maintenance of the name for the first two years. Thus, the per year cost of registration and renewal are the same.

4. This 30% assessment equals $30 of each initial registration and $15 of each annual renewal.

5. In support of their claims, plaintiffs assert that potential competitors to NSI have plans to charge between $11 and $19 per registration.

6. Plaintiffs also argue that NSI has additional sources of profit under the Agreement. It is undisputed that NSI continues to collect fees for registration and maintenance services, even though those fees cover services to be performed after the expiration of the Cooperative Agreement later this year. Plaintiffs also allege that NSI charges $10 for "expedited registration" and that it charges $49 to reserve a domain name for future registration.

Defendants dispute plaintiffs' characterizations. They argue that plaintiffs' economic models intentionally overestimate profits and underestimate costs. NSI asserts that it has incurred, and continues to incur, substantial costs. It argues that it has purchased most of its own equipment and software, and that its registration activities require substantial, expensive human involvement. NSI asserts that it performs both the relatively inexpensive "back-end registry" function that its would-be competitors might also perform, and the more expensive, "customer-facing registrar" function, which requires more man hours. Therefore, NSI argues, its fees are more closely aligned to its costs. NSI does not actually reveal those costs, but it does state that its total profits under the Cooperative Agreement are approximately $7.1 million, not the $89.7 million estimated by plaintiffs.

### F. Intellectual Infrastructure Fund

According to Amendment 4, 30% of all registration fees [7] are considered part of the "Preservation Assessment," and are placed in the Intellectual Infrastructure Fund. As of September 30, 1997, the Fund contained at least $37 million. Plaintiffs claim that, at the current rate of domain name registration, the Fund will exceed $120 million by December 1998. According to NSI's own statements, it deposits these funds and maintains the account, but it does so only as a proxy for NSF; NSI admits—and, indeed, insists—that the Intellectual Infrastructure Fund is the government's money, and that the government alone can choose how and when to spend it. NSI makes no claim at all for ownership of these funds.

Congress also seems to treat the Intellectual Infrastructure Fund as government money. In October of 1997, Congress passed the Department of Veterans Affairs and Housing and Urban Development and Independent Agencies Appropriations Act, Pub.L. No. 105–65, 111 Stat. 1344 (1997), which authorized an expenditure of $23 million on the "Next Generation Internet" program. The Next Generation program is aimed primarily at upgrading the Internet infrastructure, improving the speed and accuracy of information delivery, and increasing access for schools. Although the statute does not mention the Intellectual Infrastructure Fund by name, there is little dispute that Congress intended it as the source of funding for the Next Generation project.

There are indications that the Preservation Assessment is designed to raise funds for government use. For example NSF's Inspector General commented that "a portion of the fees obtained to register Internet addresses [should] be allocated to support further Internet development." Inspector General's Report, February 7, 1997, at 1. In order to implement this proposal, the I.G. suggested that "federal oversight of Internet addresses should generate income for the government." Id. at 9. The Report then presents the Preservation Assessment scheme as the means to generate that income for use on broader Internet projects.

## II  Plaintiffs' Summary Judgment Motion

Plaintiffs have moved for summary judgment on Counts One and Three of their Amended Complaint. In these counts, plaintiffs argue that the Preservation Assessment is an illegal tax and, therefore, that the collection of this fee must cease and that the funds must be returned. On February 2, 1998, the Court granted plaintiffs' motion for a preliminary injunction based on the allegations in these counts, and the Court enjoined defendants from spending, or otherwise using or dissipating, the money in the Intellectual Infrastructure Fund.

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is a genuine issue

---

7. The assessment applies only to registration and renewal fees; fees for expedited registration and for name reservation are not subject to the Assessment.

of fact only if there is such evidence that a reasonable jury could return a verdict for the non-moving party; a fact is material only if it might affect the outcome of the suit under applicable law. *Id.* at 248, 106 S.Ct. 2505.

Plaintiffs argue that the Preservation Assessment is an illegal tax because it was not authorized by Congress. It is clear that only Congress has the power to levy taxes. U.S. Const., Art. I, Sec. 8; *National Cable Television Ass'n, Inc. v. United States,* 415 U.S. 336, 340, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974); *Bell Atlantic Telephone Cos. v. Federal Communications Commission,* 24 F.3d 1441, 1445 (D.C.Cir.1994). It is undisputed that Congress did not itself impose the Preservation Assessment—NSF and NSI devised it in Amendment 4 to the Cooperative Agreement. Therefore, as the Court indicated in its February 2, 1998, Memorandum Opinion, plaintiffs will prevail on their claim if they show both (1) that the assessment is a tax, and (2) that Congress has not ratified the tax.

### A. Character of the Assessment

Plaintiffs argue that the Preservation Assessment is a tax; defendants argue that it is a fee, which may be collected without Congressional action, or that it is "program income," which is a category of revenue that is special to grants and cooperative agreements.

### 1. Tax or Fee

Defendants first argue that the Preservation Assessment is not a tax, but a regulatory fee. There is no single test to evaluate the assessment's character, but several cases present criteria that are useful for the Court's consideration. The Supreme Court distinguishes a tax as a payment which is arbitrarily imposed for some public purpose. In contrast, a fee is payment for a voluntary act, such as obtaining a permit, that goes to defray the expenses of regulating that act. *National Cable,* 415 U.S. at 340, 94 S.Ct. 1146; *Williams v. Motley,* 925 F.2d 741, 743 (4th Cir.1991); *United States v. Maryland,* 471 F.Supp. 1030, 1036 (D.Md.1979); *In re Farmers Frozen Food Co.,* 221 F.Supp. 385 (N.D.Cal.1963).

Other courts focus more specifically on the benefits conferred by an assessment. These courts hold that a payment is a tax when it confers no special benefit on the payee, or when the assessment is intended to raise general revenue; in contrast, a fee gives the payee value for payment, in the form of defraying the regulatory expenses necessary to keep certain services active. *See Cumberland Farms, Inc. v. State of Maine,* 116 F.3d 943, 946–47 (1st Cir.1997); *United States v. River Coal Co., Inc.,* 748 F.2d 1103, 1106 (6th Cir.1984); *Butler v. Maine,* 767 F.Supp. 17, 19 (D.Me.1991).

Finally, some courts look at the nature and value of the service provided by an agency, in exchange for the regulatory assessment. These courts hold that an assessment may be a tax if it is not fairly tied to both the value received by the payee and to the cost of the service to the agency. *See Massachusetts v. United States,* 435 U.S. 444, 464, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978); *United States Shoe Corp. v. United States,* 114 F.3d 1564, 1571 (Fed.Cir.1997). If the payee does not receive a benefit commensurate to the value of the assessment, or if the agency charges in excess of its costs and expenses, these courts hold that an assessment is a tax.

The Preservation Assessment is clearly a tax under any of these formulae. There is no dispute that the assessment is involuntary—it is automatically charged to every domain registration, and registrants cannot opt out of the charge.[8] Furthermore, NSI collects the assessment for the government's use on public goals, and not in any way to defray regulatory costs.[9] In addition,

---

**8.** Defendants argue that, because domain registration is a voluntary act, the Preservation Assessment is voluntary. This argument cannot support itself, because the assessment is not really a charge for registration, but is instead a payment above and beyond the cost of the registration itself. *See e.g., Williams v. Motley,* 925

F.2d at 743; *River Coal,* 748 F.2d at 1106. Therefore, while the payment of a fee for registration services may be voluntary, payment of the Preservation Assessment, which is a charge independent of the registration payment, is not.

**9.** Defendants assert that the assessment is not designed to raise revenue, because it is not de-

defendants admit that the cost of providing the initial registration service is at most $70; the $30 paid to the Preservation Assessment is entirely in excess of cost.[10] Thus, there is no dispute that the Preservation Assessment exists to generate revenue for public projects and goals, or that it is a fee imposed independent of and above the cost of domain name registration.

The Preservation Assessment is an involuntary assessment, it provides revenue for the government, for use on projects that do not directly benefit the payees or otherwise apply to the purposes furthered by the NSF–NSI Agreement, it is entirely in excess of the costs of the special registration services sought by plaintiffs, and it raises the overall cost of registration by nearly 50%. For these reasons, the Preservation Assessment is not a regulatory fee, but is instead a tax on registration.

### 2. Program Income

Defendants argue that, even if the Preservation Assessment resembles a tax, it is not really a tax, but is instead "program income." Defendants argue that program income is not federal in character, and that NSI can properly collect program income under the Cooperative Agreement.

Program income is a special creature that is unique to the habitat of administrative grants and cooperative agreements. OMB Circular A–110 defines it as "gross income received by the recipient [of a grant] that is directly generated by a supported activity or earned as a result of the award. Program income includes, but is not limited to, income from fees for services performed . . ." OMB Circular A–110 at Subpart A, § 2(x). The Circular further provides that program income can be retained by the grantee, and that it may be added to committed funds to further program objectives. *Id.* at Sub. C, § .24(b)(1). The Code of Federal Regulations contains a similar definition of "pro-

gram income," and contains similar language concerning its use. *See* 45 C.F.R. § 602.25(b),(g).

Defendants claim that the Preservation Assessment is program income, and that it is properly appropriated to NSF as such. The key questions before the Court are (1) whether the Preservation Assessment is program income, and (2) whether program income may be placed into a special fund for unspecified appropriation by the federal government. The concept of program income has not been treated extensively by courts or by agencies; however, the parties have cited sufficient authorities to convince the Court that the Preservation Assessment is not program income, and that program income may not, in any case, be used as defendants suggest.

#### a. Nature of Income

■ Although the OMB and C.F.R. discussions are undetailed, the scant available administrative case law suggests that "program income" refers to income from incidental transactions that are peripheral to a grant relationship. For example, in *Matter of Job Corps Center Receipts*, 65 Comp. Gen. 666, 1986 WL 60633 (C.G. June 25, 1986), an administrative judge held that receipts from a Job Corps Center's sales of meals, clothes, tool kits, and arts and crafts were program income, as were minor fines and restitution. *Job Corps*, 65 Comp. Gen. at 670–72. However, the receipts from these sales were clearly incidental to the main function of Job Corps. Similarly, in *Matter of Armed Forces Institute of Pathology*, 1978 WL 11329 (C.G. August 24, 1978), the Comptroller General considered sales of an Atlas of Tumor Pathology by universities that received federal grant money to study tumors. Again, the judge found that the sales were incidental receipts that could be retained by the grantee, for further use within the program.

posited into the federal Treasury, but into a separate fund. However, this argument rests on mere semantics—the assessment is income designed for a public purpose, which is essentially unrelated to the persons paying the fee. Where it is kept while awaiting that purpose is irrelevant. As such, it must be considered revenue for

the government, whatever name defendants wish to attach to it.

10. There is a proportional disparity in the yearly renewal fees, $35 of which go to cover costs, with $15 going to the assessment.

■ The Preservation Assessment certainly does not have the incidental characteristics of cafeteria receipts or even of a medical atlas. Under the Cooperative Agreement, collection of fees for registration services is the integral part of NSI's function, and the Preservation Assessment represents approximately 30% of NSI's gross receipts. Therefore, the assessment is not an incidental receipt, and neither the caselaw nor the administrative authorities support its characterization as program income.[11]

### b. Use of Income

As stated in the OMB Circular, a grantee may add program income to its appropriation, to be "used to further eligible project or program objectives." OMB Circular at Sub. B, § .24(b)(1). Consistent with this statement, the grantees in *Job Corps* and *Armed Forces* kept the program income, instead of sending it to the U.S. Treasury, and the income was either credited against the next appropriation or added to the appropriation. Thus, the retention of program income is clearly meant to either supplement government funding, or to reduce the amount of funding that comes out of the Treasury. Furthermore, there is no doubt that the OMB Circular 110 contemplates that program income will be spent in furtherance of grant objectives.

The first dissimilarity between the OMB Circular, the Comptroller General cases, and the present situation is that NSI receives no appropriation. NSI cannot use the Intellectual Infrastructure Fund to replace or augment any government funds, because it does not receive any such funds. Thus, the Court finds it difficult to square defendants' proposed use of this money with the uses suggested by the administrative authorities.

In addition, program income, as defined by the OMB, is retained by the grantee, for use on projects that further its program objectives. In contrast, the Preservation Assessment is not retained by NSI, but is instead earmarked for a fund controlled by NSF, and is designed for use on projects that are at best tangentially related to NSI's program objectives. Therefore, the use of the assessment contemplated by defendants does not coincide with the uses described by the OMB or by the Comptroller General.

### c. Conclusion

The Preservation Assessment cannot be considered program income, as that term is defined by OMB Circular 110, the relevant provisions in the C.F.R., and the administrative caselaw. Unlike cafeteria receipts or publication sales, collection of the assessment is hardly incidental; rather, it is an integral part of NSI's registration operation. Furthermore, unlike traditional program income, the Preservation Assessment is not retained by the grantee (NSI) for use on program objectives. Instead, it is collected for use by the government, on projects largely unrelated to the registration of domain names.

Therefore, the Court finds that the Preservation Assessment is not program income. It bears all the marks of a tax, and none of program income. The fact that NSI collects the assessment on behalf of NSF, instead of NSF collecting it directly, does not serve to launder the funds; it is still a tax, collected without Congressional approval. As such, it is illegal under Article I, § 8 of the Constitution.

### 3. Ratification

■ Even if the Preservation Assessment is an illegal tax, it still need not violate the Constitution. Article I, Section 8, does not bar taxes absolutely, but merely requires that Congress impose the taxes. It is settled law that if Congress ratifies a tax, it is proper under the Constitution, even though the Congressional approval might postdate the initial imposition and collection of the tax. *United States v. Heinszen,* 206 U.S. 370, 390,

---

11. In addition, the authorities discuss program income in the context of a federal grant relationship. NSI is not a federal grantee—unlike Job Corps or the universities, it does not receive federal appropriations to carry out its purpose. There is no indication that receipts garnered pursuant to a Cooperative Agreement can be considered program income. However, because the Court finds that the Preservation Assessment cannot be considered program income for other reasons, it need not address this issue.

27 S.Ct. 742, 51 L.Ed. 1098 (1907); *Canisius College v. United States,* 799 F.2d 18, 25 (2d Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987). Therefore, if Congress ratifies the Preservation Assessment, its collection is legal; even the past collection of monies is retroactively legal.

Congress has already addressed the issue of the Preservation Assessment, if only indirectly. In the Department of Veterans Affairs and Housing and Urban Development and Independent Agencies Appropriations Act, Pub.L. No 105–65, 111 Stat. 1344 (1997), Congress authorized NSF to expend up to $23 million on the President's Next Generation Internet project. The House and Senate Reports indicate that Congress implicitly directed that these monies be withdrawn from the Intellectual Infrastructure Fund.

■ Defendants argue that this Act represents a Congressional ratification of the Preservation Assessment, but they are incorrect. Legislation can effect a ratification only if Congress clearly recognizes the unauthorized tax and specifically states that the tax is ratified. For example, the legislation at issue in *Heinszen* effected a valid ratification of taxes collected by the military in the Philippines only because the statute recognized that the taxes had been illegally collected, and because Congress stated that those taxes "are hereby legalized and ratified." *See Heinszen,* 206 U .S. at 381. The legislation must make its purpose explicitly clear in order to effect a ratification.[12]

■ In the present case, Congress has not ratified the Preservation Assessment. The appropriations act cited by defendants never mentions the assessment or the Intellectual Infrastructure Fund. Therefore, because the Act does not contain the clear recognition of the tax and through specific ratification language, as required by *Heinszen,* it is not an effective ratification of the tax.

Congress may have intended to grant NSF the authority to collect the assessment, but it has not yet done so. It still retains the power to ratify the collection, even at this late date; there does not appear to be an expiration date on Congress's power to effect a ratification. However, if it wishes to effect such a ratification and permit NSF to use the Intellectual Infrastructure Fund, Congress must pass legislation that more explicitly conveys its intentions. Otherwise, the collection and appropriation of the Preservation Assessment remains illegal.

### B. Statutory Claims

In Count Three, plaintiffs argue that collection of the Preservation Assessment is improper under the Independent Offices Appropriation Act (IOAA). The IOAA provides that an agency may only collect fees that are (1) fair, and (2) based on costs, value, public policy, or some other relevant factor. 31 U.S.C. § 9701. The Supreme Court interprets the statute to prohibit an agency from collecting nearly any payment that exceeds the agency's cost. *National Cable,* 415 U.S. at 343, 94 S.Ct. 1146. Therefore, argue plaintiffs, if the Preservation Assessment is an illegal tax, it also violates the IOAA.

■ As the Court has described above, the Preservation Assessment is a tax, and it would be unlawful for an agency to collect it under the IOAA. However, NSI, which collects the assessment, is not a government entity; therefore, the Court does not see that the statute can apply in this case. Furthermore, the IOAA applies only to fees collected for government services, and this fee is not imposed on top of a government service, but a private one. Therefore, although the Preservation Assessment is an illegal tax, it does not fall within the scope of the IOAA. For this reason, the Court must deny plaintiffs' motion as to Count Three. However, plaintiffs seek parallel relief for each count;

---

12. In addition, the Act is an appropriations bill, and it is well recognized that Congress does not normally perform legislative functions—such as ratification—through appropriations bills. *See e.g., National Audubon Society v. Andrus,* 442 F.Supp. 42, 45 (D.D.C.1977). This does not mean that Congress cannot effect a ratification through an appropriations bill, but it does mean that Congress must be especially clear about its intention to do so. *Associated Electric Co-op., Inc. v. Morton,* 507 F.2d 1167, 1174 (D.C.Cir. 1974), *cert. denied,* 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47 (1975).

therefore, plaintiffs are entitled to full relief under Count One.

### C. Conclusion

■ The Court will grant judgment for plaintiffs on the issue of defendants' liability under Count One of the Amended Complaint. The Court will not, at this time, address the issue of the proper remedy for that liability, however. Unless Congress acts to ratify the collection of the Preservation Assessment, plaintiffs may be entitled to a refund of the taxes that they have paid. There is, however, a material question of fact as to the extent of this refund; among other issues, it is unclear how much money the Intellectual Infrastructure Fund contains. Furthermore, plaintiffs have filed a motion for class certification, which could substantially expand the scope of their relief. For these reasons, the Court will grant summary judgment for plaintiffs on Count One, but will defer the entry of relief until it has decided the class certification motion.

### III Plaintiffs' Motion for a Preliminary Injunction

Plaintiffs' motion for a preliminary injunction, originally asked the Court to enjoin defendants from continuing to operate the domain registration system and to freeze $89.7 million of NSI's assets.[13] Plaintiffs have since scaled back their request; they now ask the Court to: (1) enjoin NSI from transferring any funds to Science Applications International Corporation (SAIC), which may or may not be its parent corporation, (2) appoint a Special Master in this case, (3) enjoin NSI to place all fees collected for yearly renewal of domain names and for reservation of domain names for future use into a trust account specified by the Special Master, (4) order the General Accounting Office (GAO) to perform an audit of NSI to determine the company's actual cost of providing registration and renewal services, (5) order NSI to make available to GAO all relevant records, and (6) enjoin NSI to return to NSF any intellectual property that NSF requests at the expiration of the Coop-

erative Agreement. Even with this scaling back, however, plaintiffs still ask the Court to enter an injunction that cuts a broad swath through NSI's corporate operations. Plaintiffs base their request for injunctive relief on the claims set forth in Count Two and Counts Four through Ten of their Amended Complaint, which allege that the system under which NSI is permitted to charge fees for the registration of domain names is illegal.

The standard for preliminary injunctions is dictated by Federal Rule of Civil Procedure 65(a). Under that Rule, the Court may grant preliminary injunctive relief if the moving party demonstrates (1) that it is likely to succeed on the merits of the claim, (2) that it will suffer irreparable harm if not granted injunctive relief, (3) that other parties will not suffer substantial harm, and (4) that the public interest is served by an injunction. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977). The standard is essentially a balancing test; the Court examines each requirement in light of the others to determine whether an injunction would be proper. *Id.* at 843.

Plaintiffs are unable to show sufficient irreparable injury to justify the broad relief that they request. In addition, there is a substantial risk of harm to defendant NSI and to the general public if the Court orders such a comprehensive injunction. Finally, plaintiffs have not shown a substantial likelihood of success on the merits; indeed, the Court will dismiss most counts of plaintiffs' Amended Complaint for failure to state a claim upon which relief could be granted.

### A. Irreparable Injury

■ The threat of irreparable injury is perhaps the key reason to grant a motion for preliminary injunction. *See e.g., Buckingham Corp. v. Karp,* 762 F.2d 257, 262 (2d Cir.1985). In the present case, plaintiffs cannot demonstrate that they would suffer any injury if the Court denies their motion. Plaintiffs seek only to remedy their economic

---

13. Plaintiffs originally asked for a temporary restraining order, but they agreed to drop that request and to seek only a preliminary injunction.

injury; courts are generally reluctant to grant injunctions to protect such injuries, unless there is evidence that the defendant plans a substantial dissipation of assets, so that no economic judgment could be satisfied. *See e.g., Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290, 61 S.Ct. 229, 85 L.Ed. 189 (1940) (Substantial evidence that defendant on brink of insolvency, and that it was about to pay out remaining funds); *U.S. v. Singer*, 889 F.2d 1327, 1331 (4th Cir.1989) (Company has planned sales of bulk of assets); *Tri–State Generation and Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 355–56 (10th Cir.1986) (Company has firm plans to sell assets and distribute proceeds to members); *Foltz v. U.S. News & World Report*, 760 F.2d 1300 (D.C.Cir.1985) (Planned distribution from pension fund threatened to dissipate most of fund's assets).

Plaintiffs fail to demonstrate that they would have any trouble collecting a judgment from defendants. There is no allegation that NSI is in danger of going out of business, or of being unable to satisfy a later judgment. In addition, there is little evidence that NSI plans to dissipate any assets. At most, plaintiffs allege that NSI will transfer money to its former parent, SAIC, but plaintiffs do not present any evidence that such transfers will substantially reduce NSI's capital. Furthermore, there are no allegations that NSI is on the verge of insolvency, or that it will cease to return profits from which to pay a judgment. Indeed, plaintiffs argue in this case that NSI makes a 300% profit on each registration; if that is true, then NSI is perhaps too profitable, not teetering on the brink of collapse.

For these reasons, plaintiffs have not shown that they are threatened with any irreparable injury that is sufficient to warrant injunctive relief.

### B. Injury to Other Persons

NSI would likely have suffered substantial harm under plaintiffs' original request, since a freeze of nearly $90 million would potentially have halted NSI's business activity and sent its stock into a freefall. Plaintiffs' modified request—a ban ·on transfers to SAIC and the deposit of certain fees into a trust account—might not have such a substantial effect, especially since NSI maintains that it does not plan any substantial transfers to SAIC in the near future. However, it would have some deleterious effect, if only by tying NSI's hands in the operation of its business affairs.

Plaintiffs' request certainly threatens some harm to the general public. Several hundred thousand persons seek to register domain names every month. If the Court entered an injunction that affected NSI's business activity and that harmed the domain registration process, the public might suffer real, tangible injury. Although this injury is not so substantial as to prove dispositive, it certainly tips the scales against plaintiffs' motion.

### C. Success on the Merits

Finally, plaintiffs cannot show a likelihood of success on the merits. The Court has granted plaintiffs summary judgment on Count One, but this motion does not implicate that count. As the Court will describe below, it must dismiss all plaintiffs' other counts. Therefore, plaintiffs have no prospect of success on the merits of the claims upon which this motion is based. For this reason, the Court must deny plaintiffs' motion.

### IV  Defendants' Motions to Dismiss

Both NSI and NSF move to dismiss plaintiffs' Amended Complaint in its entirety, for failure to state a claim, or, in the alternative, for summary judgment on all counts. As the Court has indicated above, plaintiffs are entitled to summary judgment on Count One of the Amended Complaint, but the claims in Count Three lack merit. Therefore, the Court will deny defendants' motions as to Count One, but grant it as to Count Three.

As to the remaining eight counts, dismissal is appropriate "only if 'it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations.'" *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Martin v. Ezeagu*, 816 F.Supp. 20, 23 (D.D.C. 1993). In evaluating a motion to dismiss, the Court must construe the complaint in the

light most favorable to plaintiff and give plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C.Cir. 1979).

Plaintiffs' remaining counts concern alleged improprieties by NSF and NSI in regard to the adoption of Amendment 4 to the Cooperative Agreement. Plaintiffs first allege that the fees charged by NSI for initial registration and for yearly renewal fees are illegal taxes (Count Two), that they violate the IOAA (Count Four), and that they were adopted in violation of the APA (Count Five). Plaintiffs also allege that NSI collects fees for services to be performed after the Cooperative Agreement expires, in violation of the Agreement (Count Six), and that these fees also are illegal taxes, violate the APA, and violate the IOAA (Count Seven). Plaintiffs further argue that the Cooperative Agreement itself violates Article IV, § 3 of the Constitution, which governs transfers of federal property (Count Eight). Finally, plaintiffs argue that the arrangement between NSI and NSF creates antitrust violations under the Sherman Act (Counts Nine and Ten).

■ Defendants argue that each of these counts fails to state a claim upon which relief could be granted.[14]

### A. *Registration and Renewal Fees (Counts Two, Four, Five)*

Plaintiffs first attack NSI's share of the registration and renewal fees ( the "NSI fees"), which make up 70% of total collections.[15] Plaintiffs assert that these fees greatly exceed NSI's cost of providing the services; therefore, plaintiffs argue that collecting these fees is illegal and violates the Constitution (Count Two), the provisions of the IOAA (Count Four), and the APA (Count Five).

### 1. *Constitutional Violation*

Plaintiffs argue that, to the extent that the NSI fees exceed costs, they are a tax, not a fee for service. Since it is undisputed that Congress did not impose this charge and has not ratified it, plaintiffs argue that the fee is illegal under Article I, § 8 of the Constitution.

■ This argument is similar to the argument that plaintiffs present in favor of their motion for summary judgment. However, the NSI fees are substantially different than the Preservation Assessment, and they are not taxes under any of the criteria that the Court applied above. First, the Preservation Assessment fees are collected for government use, while the government does not benefit in any way from the NSI fees, because NSI keeps them for itself. Therefore, the NSI fees do not raise any revenue for the government.

In addition, unlike the Preservation Assessment, the NSI fees are paid as a true fee for services. It is undisputed that the Preservation Assessment is simply an added-on charge; it is in no way linked to the registration services, except that anyone paying for the services is also required to pay the assessment. In contrast, however, the NSI fees are linked to the registration services— they are payments to cover costs and profits for NSI, the entity that provides the services.

■ Furthermore, plaintiffs paid the NSI fees pursuant to a voluntary contract between private parties. Plaintiffs argue that their contracts with NSI are not voluntary, because NSF, a government agency, has stacked the system so that users are forced to contract with NSI to receive the services they need. However, a contract is not involuntary because it flows from a monopoly, even if the government (or its agent) holds that monopoly, as long as the monopolist is

---

14. Defendants also argue that plaintiffs' claims are barred by the doctrine of laches. However, plaintiffs present substantial allegations that defendants' hands are dirtied by illegal dealings; therefore, defendants' may be barred from asserting the laches defense. *See e.g., Pfieffer v. CIA*, 60 F.3d 861, 865 (D.C.Cir.1995). Furthermore, in light of the secretive nature in which

Amendment 4 emerged, and given NSI's reluctance to release details about its operation, plaintiffs' 18 month delay in bringing suit cannot be considered inexcusable.

15. NSI's share is $70 of the $100 initial fee and $35 of the $50 renewal.

merely servicing an existing need, and has not created the need itself. *See Yosemite Park and Curry Co. v. United States*, 231 Ct.Cl. 393, 686 F.2d 925, 931–32 (Cl.Ct.1982). Thus, in *Yosemite*, the Park Service was a monopolist provider of electricity to park merchants, and it set its rates above cost, at a market rate. The court held that the government did not create the need for electricity, but merely serviced the need that the merchants themselves created. Therefore, the fee was not illegal.

The present situation is similar. There is no arbitrary need for NSI's services; NSI does not provide a government-mandated license, for example. Instead, NSI provides a service that plaintiffs and other users would desire, even if the government were never involved. Therefore NSI can charge a market rate, even though it exceeds costs, and even if it is acting as a government agent, as plaintiffs assert.

The NSI fees are not collected as revenue for the federal government; they are paid pursuant to a voluntary contract between two private parties, and they are paid as value for services rendered and received. Therefore, plaintiffs cannot demonstrate that the NSI fees are a tax, much less an illegal one. For this reason, the Court will dismiss Count Two of the Amended Complaint.

### 2. IOAA

Plaintiffs next contend that the NSI fees violate the IOAA, which requires that fees charged for federal services must be set according to certain criteria, particularly the cost and value of those services. 31 U.S.C. § 9701. The Supreme Court has held that the cost of the service is primary among all criteria. *National Cable*, 415 U.S. at 343, 94 S.Ct. 1146. Therefore, plaintiffs' allegations that NSI sets its rates substantially in excess of costs might implicate the IOAA.

The problem, however, is that the statute applies only to a "service or thing of value provided by an agency." 31 U.S.C. § 9701(b). NSI is clearly not a federal agency, and the NSI fees are clearly not charged by a federal agency for federal services. Plaintiffs argue that NSI is a quasi-federal actor,[16] but this allegation is still insufficient to bring NSI within the scope of the IOAA, which extends only to fees charged by agencies for their products and services. Therefore, the Court must dismiss Count Four of the Amended Complaint.

### 3. APA and Registration Fees

Plaintiffs also argue that the imposition of fees in Amendment 4 violates the APA. That statute requires safeguards on agency action such as notice of a rulemaking, comment on the rulemaking, and a statement of purpose by the agency. *See e.g., Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C.Cir.1977). There is no dispute that NSF did not undergo any rulemaking procedures or issue any public findings or statement of reasons to support Amendment 4, which created the present fee structure.

Plaintiffs present two arguments that implicate the APA. First, they argue that the fees violate the IOAA, which means that they presumptively violate the APA. Second, plaintiffs argue that, because these fees were set without notice and comment, and because NSF never produced a statement of its reasons, they violate the APA. *See e.g., Engine Manufacturers Ass'n v. E.P.A.*, 20 F.3d 1177, 1181–83 (D.C.Cir.1994) (APA requires that agency setting fees must release public findings to support decision); *Federal Election Comm'n v. Rose*, 806 F.2d 1081, 1088 (D.C.Cir.1986) (Agency action without explanation presumptively violates APA).

The Court has described that the IOAA does not apply to the NSI fees; therefore, plaintiffs' first argument lacks merit. As to the second argument, the statute excepts from the notice and comment requirement all matters that involve "public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). The exception is intend-

---

**16.** Plaintiffs argue that a private individual can be considered a *de facto* federal actor, subject to federal constitutional and statutory constraints. *See e.g., Berger v. Hanlon*, 129 F.3d 505 (9th Cir.1997); *Dobyns v. E–Systems*, 667 F.2d 1219 (5th Cir.1982). However, while defendants' conduct may bring them within the reach of these cases, the cases do not suggest that a private actor is subject to administrative, agency regulations such the IOAA.

ed to grant agencies latitude to engage in contracts; the potential public impact of a contract does not divest the exception of its force. *Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070, 1083–84 (D.C.Cir. 1978); *Duke City Lumber v. Butz*, 382 F.Supp. 362, 374 (D.D.C.1974) (Agency has wide discretion under public contracts exception to decide what, if any, rulemaking to follow). The Cooperative Agreement clearly concerns a public contract. As such, it falls within the § 553(a)(2) exception. For this reason, the APA does not apply to the NSI fees, and the Court must dismiss Count Five of the Amended Complaint.

### B. Fees for Future Services (Counts Six and Seven)

Plaintiffs also allege that NSI is charging fees for "future services;" that is, services which are scheduled to be performed in whole or in part after the Cooperative Agreement expires. Plaintiffs allege that NSI is receiving full payment for these services, even though it may not play a role in providing those services after September 1998. Included among these future services are a $49 fee for reservation of a domain name [17] and the fees for certain renewals and initial registrations.[18] Plaintiffs argue that collection of these fees violates the Cooperative Agreement (Count Six), that the fees are illegal taxes, and that the fees violate the IOAA and the APA (Count Seven).

The Court must dismiss Count Six, because plaintiffs are suing to enforce the Cooperative Agreement, even though they are not parties to the contract. Clearly, plaintiffs lack standing to directly enforce the Agreement, there is no suggestion that they have third party standing. *See e.g., Beckett v. Air Line Pilots*, 995 F.2d 280, 286 (D.C.Cir.1993) (Third party may challenge contract only if contracting parties intended to create enforceable contract rights in the third party). Therefore, if indeed NSI is violating the Agreement, it is up to NSF, or some other proper party, to take action.

Plaintiffs make a strong showing that NSI is reaping a substantial profit in excess of its cost. The charge for maintenance beyond September could be a huge windfall if NSI's contract expires and the company never has to provide that service. More strikingly, the $49 fee to reserve a name is payment for a service that costs NSI nothing; the company does not really register or maintain anything, it only puts a name on hold.[19]

Despite strong evidence that NSI's fees greatly exceed its costs of providing these future services, plaintiffs make essentially the same arguments as they do in Counts Two, Four, and Five. The Court's analysis must be essentially the same as well. As discussed in Subsection A, above, these privately collected, privately retained fees are certainly not a tax, and plaintiffs cannot show that NSI is subject to the restrictions of the IOAA or of the APA.

Thus, although plaintiffs present strong evidence to suggest that NSI has used its position to charge fees that greatly exceed their costs, plaintiffs have not stated a claim against the company. Plaintiffs lack standing to bring suit for violation of the Cooperative Agreement, and they do not have a cause of action under Article I, § 8 of the Constitution, the IOAA, or the APA. For these reasons, the Court must dismiss Counts Six and Seven.

### C. Disposal of Property (Count Eight)

Article IV, § 3 of the Constitution provides that only Congress has the power to dispose of property of the United States. Plaintiffs

---

**17.** This fee is different from the registration fee. It enables a user who foresees a need for a certain name to reserve that name for future use, without immediately paying a registration fee. Thus, a user can pay $49 to reserve the name now—foreclosing another user from taking the name—and only begin to pay registration and maintenance charges when ready to use the name.

**18.** Plaintiffs allege that every renewal received after September 1997 and every initial registration received after September 1996 is a future charge, because it obligates NSI to perform some maintenance services beyond the expiration of the Cooperative Agreement.

**19.** NSI does not assert that name reservation for future use creates any significant opportunity costs.

argue that NSF violated this clause by disposing of federal property—the domain name registry, and perhaps some hardware and software—when it entered into the Cooperative Agreement.

■ Congress authorized NSF to dispose of this property, however. In NSF's enabling legislation, Congress empowered the agency to "foster and support" the development of computer technology. 42 U.S.C. § 1862(a),(g). In order to ease this mission, Congress empowered the NSF "to hold and dispose of by grant, sale, lease or loan, real or personal property of all kinds necessary for, or resulting from, the exercise of authority granted by this chapter." 42 U.S.C. § 1870(e). Because Congress has authorized NSF to dispose of property in pursuit of its statutory objectives, the disposal of property by NSF does not offend the Constitution. For this reason, the Court must dismiss Count Eight of the Amended Complaint.

### D. Sherman Act (Counts Nine, Ten)

■ Finally, plaintiffs assert that NSI and NSF are engaged in a conspiracy to create a monopoly (Count Nine) and that NSI is operating as an illegal monopoly (Count Ten), in violation of the Sherman Act. It is clear, however, that NSF, as an agency of the federal government, is immune from suit under the Sherman Act. *Sea–Land Service, Inc. v. Alaska Railroad,* 659 F.2d 243, 245–47 (D.C.Cir.1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982). Therefore, Count Nine must be dismissed as to NSF, on the grounds that it is immune from suit.

■ NSI also asserts immunity from suit. Under the federal instrumentality doctrine, private parties acting in compliance with a clearly articulated government program are immunized to the same extent as the government entity. *Southern Motor Carriers Rate Conf. v. United States,* 471 U.S. 48, 56–57, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985); *IT & E Overseas, Inc. v. RCA Global Communications, Inc.,* 747 F.Supp. 6, 11–14 (D.D.C. 1990). For example, in *IT & E,* a private telephone company that had contracted with the Guam legislature and the United States Navy to provide long distance service on Guam was immune from suit under the Sherman Act, by virtue of its contract with the federal agents.

■ This doctrine applies to NSI in the present case. Plaintiffs make reasonable allegations that NSI is a monopolist, but the monopoly results from the Agreement between defendants. Because NSI is acting in compliance with a government cooperative agreement, therefore, it is entitled to immunity from suit under the Sherman Act.[20] For this reason, the Court must dismiss Counts Nine and Ten of the Amended Complaint.[21]

### VII  Conclusion

Plaintiffs have filed motions for summary judgment on Counts One and Three of the Amended Complaint, and for a preliminary injunction based on all other counts, and defendants have filed motions to dismiss all counts. Plaintiffs are entitled to summary judgment on Count One, because they have shown that the Preservation Assessment is an illegal tax, but not on Count Three, because they have not shown that the assessment is covered under the IOAA.

The Court must deny plaintiffs' motion for a preliminary injunction, because plaintiffs do not show irreparable injury and do not show that the balance of equities tips in their

---

20. The Supreme Court's Opinion in *Otter Tail Power Co. v. U.S.,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), cited by plaintiffs, does not suggest otherwise. In that case, the Court held that power companies were not immunized merely because the Federal Power Act required that they provide electrical connections to small communities. However, in *Otter Tail,* there was no contract between the private companies and any federal agency; therefore there was no immunity. In the present case, there is such a contract between NSF and NSI.

21. Plaintiffs assert that the Justice Department is investigating NSI for violations of the Sherman Act in connection with the Cooperative Agreement. That bare allegation, however, does not provide the Court with sufficient reason to disregard NSI's immunity. Furthermore, without more information about the investigation, it is unclear that plaintiffs would have standing to bring a claim.

favor. Moreover, because the Court will dismiss plaintiffs' remaining claims, they cannot show a likelihood of success on the merits.

The Court will grant summary judgment for plaintiffs on Count One; therefore, the Court must deny defendants' motions to dismiss as to that count. As to all other counts, however, plaintiffs fail to state a claim upon which relief can be granted. For this reason, the Court will grant defendants' motions and dismiss Counts Two through Ten.