William THOMAS, et al., Appellants,

v.

NETWORK SOLUTIONS, INC. and National Science Foundation, Appellees.

No. 98–5502.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 25, 1999.

Decided May 14, 1999.

Rehearing and Rehearing En Banc Denied July 8, 1999.

William H. Bode argued the cause for appellants. With him on the briefs were James M. Ludwig and Daniel E. Cohen.

Lisa Goldfluss, Assistant U.S. Attorney, argued the cause for appellee National Science Foundation. With her on the brief were Wilma A. Lewis, U.S. Attorney, R. Craig Lawrence, Assistant U.S. Attorney, and Lawrence Rudolph, General Counsel, National Science Foundation.

Michael L. Burack argued the cause for appellee Network Solutions, Inc. With him on the brief were Lloyd N. Cutler, C. Loring Jetton, Jr., Matthew P. Previn, and Philip L. Sbarbaro.

Before: RANDOLPH, ROGERS, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This is an appeal from the judgment of the district court dismissing a complaint filed against the National Science Foundation ("NSF") and its private contractor, Network Solutions, Inc. Plaintiffs are individuals and entities who registered Internet domain names through Network Solutions, Inc., paying a one-time registration fee and yearly renewal fees thereafter, a portion of which the company paid over to NSF according to the terms of a government contract. The complaint alleged, among other things, that NSF had imposed and collected an unconstitutional tax, that Network Solutions had violated the antitrust laws, and that the amount of the fees charged pursuant to the contract exceeded a limitation imposed by statute.

## I

### A

The Internet, "an international network of interconnected computers," *Reno v. ACLU*, 521 U.S. 844, 117 S.Ct. 2329, 2334, 138 L.Ed.2d 874 (1997), developed from the ARPANET, a network the United States military created in 1969 to link its computers with those of defense contractors and universities. *See* 63 Fed.Reg. 31,741 (1998). The ARPANET, which no longer exists, served as a model for similar nonmilitary networks. *See id.*; *see also* 63 Fed.Reg. 8826 (1998). These networks eventually linked with each other and coalesced into the backbone of the modern Internet, *see* 63 Fed.Reg. at 8826, enabling tens of millions of people to communicate with one another and to gain access to vast amounts of information from around the world, *see ACLU*, 117 S.Ct. at 2334.

Internet use has grown dramatically in the past two decades. The number of networked "host" computers—those that store information and relay communications—increased from about 300 in 1981 to approximately 9.4 million in 1996. *See id.* Roughly 60 percent of these host computers are located in the United States. *See id.* About 40 million people used the Internet in 1996, a number expected to rise to 200 million this year. *See id.*

Individuals generally obtain access to the Internet through these host computers, each of which has a numerical address, or Internet Protocol number, such as "98.37.241.30," that allows other host computers to identify and locate it.[1] *See* 63 Fed.Reg. at 8826; *see also* 63 Fed.Reg. at 31,741. When the Internet was in its infancy, Internet Protocol numbers were as-

---

1. An Internet Protocol address consists of four numbers, each between 0 and 255, separated by periods. *See PGMedia, Inc. v. Network Solutions*, No. 97 Civ. 1946 RPP, slip op. at 3, 1999 WL 144494 (S.D.N.Y. Mar. 16, 1999); *see also* Josh A. Goldfoot, Note, *Antitrust Implications of Internet Administration*, 84 VA. L. REV. 909, 913 (1998). The first number signifies the computer's geographic region; the second number a specific Internet Service Provider; the third a specific group of computers; and the fourth a specific computer within that group. *See* G. Peter Albert, Jr., *Eminent Domain Names: The Struggle to Gain Control of the Internet Domain Name System*, 16 J. MARSHALL J. COMPUTERS & INFO. L. 781, 784 (1998).

signed and maintained by the late Dr. Jon Postel, then a UCLA graduate student working under a contract between the Defense Department and the university. *See* 63 Fed.Reg. at 31,741. When Dr. Postel moved from UCLA to the Information Sciences Institute at the University of Southern California, he continued to maintain the lists pursuant to contracts with the Defense Department. *See id.* As the lists grew, Dr. Postel delegated certain aspects of the list maintenance to what eventually became known as the Internet Assigned Numbers Authority. *See id.*

Because many numerical sequences are difficult to remember, the Internet community created a system allowing an Internet computer to be identified by a "domain name." *See* 62 Fed.Reg. 35,896 (1997). The domain name system is a hierarchy. *See* 63 Fed.Reg. at 8826. Top-level domains are divided into second-level domains, and so on. *See id.* More than 200 national, or country-code, top-level domains—*e.g.*, ".us" for the United States, ".pa" for Panama, ".uk" for the United Kingdom, and so on—are administered by their corresponding governments or by private entities with the government's permission. *See* 63 Fed.Reg. at 31,742. A small set of generic top-level domains carry no national identifier, but denote the intended function of that portion of the domain space: ".com" for commercial users; ".org" for non-profit organizations; ".net" for network. service providers; ".edu" for educational institutions; ".gov" for United States government institutions; ".mil" for United States military institutions; and ".int" for international institutions. *See* 63 Fed.Reg. at 31,742.

Domain names—*e.g.*, bettyandnicks.com—consist of at least two groups of alphanumeric characters, each known as a string, separated by a period or dot. The last string—the farthest to the right—denotes the top-level domain. The second-to-last string is the second-level domain name and identifies the person's or organization's Internet computer site. *See* Albert, *supra* note 1, at 783. Each string may contain up to 63 characters but the overall domain name must be less than 256 characters. *See PGMedia, Inc.,* No. 97 Civ. 1946 RPP, slip op. at 3.

For the domain name system to function, each domain name must be unique and correspond to a unique Internet Protocol number. *See* 63 Fed.Reg. at 8826; *see also* Goldfoot, *supra* note 1, at 913. A new user who wishes to have an Internet site with a domain name address first obtains an Internet Protocol number (*e.g.*, 1.23.456.7). *See PGMedia, Inc.,* No. 97 Civ. 1946 RPP, slip op. at 5. The user then registers a domain name and it becomes linked with that Internet Protocol number. *See id.* at 5–6.

Before using a domain name to locate an Internet computer site in "cyberspace," a computer must match the domain name to the domain name's Internet Protocol number.[2] The match information is stored on various Internet-connected computers around the world known as domain name servers. The computer attempts to find the match information by sending out an address query.[3] The goal of the address query is to find the particular domain name server containing the match information the user seeks. *See id.* at 4–5.

When ordered to translate an unknown domain name into an Internet Protocol number, a computer will ask its Internet Service Provider's server if it knows the domain name and corresponding Internet

---

**2.** A domain name does not signal where a computer is physically located. A computer may be moved from one place to another while retaining the same domain name. Thus a domain name is not an address as typically understood but instead is a mark identifying a specific person's or organization's site on the Internet. *See* Albert, *supra* note 1, at 785.

**3.** A computer user typically initiates an address query by typing a domain name into an application such as a web browser. *See* Albert, *supra* note 1, at 785.

Protocol number. *See* Albert, *supra* note 1, at 785. If that server lacks the information, it will pass the query to a "root server," also called a "root zone" file, the authoritative and highest level of the domain name system database.[4] *See* 63 Fed. Reg. at 8826. The root zone file directs the query to the proper top-level domain zone file, which contains the domain names in a given domain and their corresponding Internet Protocol numbers. *See* 63 Fed. Reg. at 8828. In the case of someone searching for the "bettyandnicks.com" home page, the root zone file sends the query to the top-level domain zone file with information about ".com" domain names. The ".com" zone file then refers the query to a second-level domain name file with all the second-level domain names under ".com." This is where the "bettyandnicks.com" query ends: the second-level domain name file has the information matching the domain name to its associated Internet Protocol number. With the Internet Protocol number, the user's computer can connect the user to the requested Internet site. The "bettyandnicks.com" home page will appear, just as if the user had typed in the Internet Protocol number instead of the domain name. *See PGMedia, Inc.*, No. 97 Civ. 1946 RPP, slip op. at 5.

Initially, the Internet Assigned Numbers Authority retained responsibility for both Internet Protocol number allocation and domain name registration. *See id.* at 7. In 1991 and 1992, NSF, an independent agency of the federal government, assumed responsibility for coordinating and funding the management of the nonmilitary portion of the Internet infrastructure.[5]

In March 1992, NSF solicited competitive proposals to provide a variety of infrastructure services, including domain name registration services. NSF issued the solicitation pursuant to the National Science Foundation Act of 1950, 42 U.S.C. §§ 1861–1887, as amended, and the Federal Grant and Cooperative Agreement Act, 31 U.S.C. §§ 6301–6308.[6] In December 1992, after an independent review of the proposals responsive to the solicitation, NSF selected the bid from, and entered into a cooperative agreement with, Network Solutions, Inc., a private company.

B

The dispute in this case turns partly on the terms of the cooperative agreement, which took effect January 1, 1993, and, as amended, runs through September 30,

---

4. There are 13 root servers, named A through M, which together contain authoritative domain name databases. *See* 63 Fed.Reg. at 31,742. Information that a domain name is associated with a certain Internet Protocol number goes on the A root server. *See PGMedia, Inc.*, No. 97 Civ. 1946 RPP, slip op. at 6. Servers B through M download new domain name registration and Internet Protocol number information on a voluntary and daily basis from the A root server. *See* 63 Fed.Reg. at 31,742; *see also PGMedia, Inc.*, No. 97 Civ. 1946 RPP, slip op. at 6. In this way, no matter which root server a user's computer utilizes to commence an address inquiry, the query can be completed successfully. *See PGMedia, Inc.*, No. 97 Civ. 1946 RPP, slip op. at 6.

5. The NSF's role in the Internet's evolution began even earlier. In 1987, the NSF awarded grants to IBM, MCI, and Merit to develop the NSFNET, a national high-speed network based on Internet protocols. *See* 63 Fed.Reg. at 31,742. The NSFNET, the largest of the governmental networks, provided the "backbone" to connect other networks serving more than 4,000 research and educational institutions throughout the country. *See id.* In 1992, Congress gave the NSF statutory authority to allow commercial activity on the NSFNET. *See id.* This facilitated connections between NSFNET and newly forming commercial network service providers, paving the way for today's Internet. *See id.*

6. The solicitation did not anticipate the explosion in the volume of domain name registrations that would occur. Only 3,950 nonmilitary domain names were registered at the time of the solicitation, and monthly registrations averaged 229. By September 1997, the rate of registrations reached 125,000 per month, and there were roughly 1.9 million names registered.

2000, at the latest. Network Solutions became the exclusive registry and exclusive registrar for the ".com," ".org," ".net," and ".edu" top-level domains. *See* 63 Fed.Reg. at 8828. As a registry, Network Solutions maintains a top-level domain's zone files, the directory databases listing domain names and their Internet Protocol numbers. *See* 63 Fed.Reg. at 8828. As registrar, Network Solutions acts as go-between for domain-name holders and the registry, providing various services, including the registration of domain names on a first-come, first-served basis. *See* 63 Fed. Reg. at 8828. The company also currently maintains the "A" root server, *see supra* note 4.

The agreement provided that NSF would compensate Network Solutions in accordance with a cost-plus-fixed-fee arrangement. The cost-plus-fixed-fee arrangement ended on September 14, 1995. Pursuant to an amendment to the agreement, Network Solutions started charging domain name registrants a one-time registration fee of $100 for registration services for the first two-year period, and $50 per year thereafter, with 70 percent of the fees going to Network Solutions as "consideration for the services provided" and 30 percent set aside, in a custodial account held by Network Solutions on NSF's behalf, for preserving and enhancing the "Intellectual Infrastructure of the Internet." The 30 percent portion—the "Preservation Assessment"—was discontinued for registrations made on or after April 1, 1998.[7]

Plaintiffs are individuals and companies (collectively "registrants") who paid fees to Network Solutions to register and maintain their domain names. They sued Network Solutions and NSF claiming that the domain name fees violated the Constitution, the Sherman Act, the Independent Offices Appropriation Act, and the Administrative Procedure Act. They sought

damages, declaratory and injunctive relief, refund of the fees earmarked for the Preservation Assessment, and return of the above-cost portion of the fees they paid to Network Solutions between September 14, 1995, and March 31, 1998, for registration services.

On April 6, 1998, the district court dismissed most of the claims, but held that the Preservation Assessment was an above-cost tax Congress had not authorized and hence was unconstitutional. *See Thomas v. Network Solutions, Inc.,* 2 F.Supp.2d 22, 31–32 (D.D.C.1998). Within weeks, Congress passed and the President signed into law § 8003 of the Fiscal Year 1998 Supplemental Appropriations and Rescissions Act, Pub.L. No. 105–174, 112 Stat. 58. Section 8003 is as follows:

RATIFICATION OF INTERNET INTELLECTUAL INFRASTRUCTURE FEE. (a) The 30 percent portion of the fee charged by Network Solutions, Inc. between September 14, 1995 and March 31, 1998 for registration or renewal of an Internet second-level domain name, which portion was to be expended for the preservation and enhancement of the intellectual infrastructure of the Internet under a cooperative agreement with the National Science Foundation, and which portion was held to have been collected without authority in William Thomas et al. v. Network Solutions, Inc. and National Science Foundation, Civ. No. 97–2412, is hereby legalized and ratified and confirmed as fully to all intents and purposes as if the same had, by prior act of Congress, been specifically authorized and directed.

(b) The National Science Foundation is authorized and directed to deposit all money remaining in the Internet Intellectual Infrastructure Fund into the Treasury and credit that amount to its Fiscal Year 1998 Research and Related

---

**7.** At that time, Network Solutions started charging $70 for registration services for the first two-year period, and $35 per year thereafter. Later in 1998, NSF transferred responsibility for administering its cooperative agreement with Network Solutions to the Department of Commerce.

Activities appropriation to be available until expended for the support of networking activities, including the Next Generation Internet.

112 Stat. 58, 93–94. Holding that § 8003 ratified the Preservation Assessment and thus mooted the sole surviving claim, the district court dismissed the entire case on August 28, 1998. On October 23, 1998, plaintiffs moved for reconsideration under FED. R. CIV. P. 60(b). The district court heard argument on the Rule 60(b) motion on November 24, 1998, ruling from the bench in defendants' favor. Registrants now appeal portions of the April 1998 and August 1998 district court orders.[8]

## II

■ To begin, we shall assume, *arguendo*, that the 30 percent portion of the domain name registration fee Network Solutions collected and held for NSF constituted an illegal tax because, as the district court decided, NSF lacked congressional authorization. As all parties agree, this is not necessarily fatal because legislation may confirm and render lawful otherwise unlawful federal agency actions imposing charges on others. An old Supreme Court case—rarely cited but never overruled—stands for the proposition that Congress "has the power to ratify the acts which it might have authorized" in the first place, so long as the ratification "does not interfere with intervening rights." *United States v. Heinszen & Co.*, 206 U.S. 370, 384, 27 S.Ct. 742, 51 L.Ed. 1098 (1907).[9]

In view of *Heinszen,* registrants pose two questions: did Congress, in § 8003 of the 1998 supplemental appropriations act, mean to ratify the Preservation Assessment; and, if so, was Congress barred from ratifying NSF's action on the ground that it could not have authorized NSF to impose the assessment at any time.

■ As to the first question, the argument against ratification proceeds on the basis that if Congress had wanted to confirm the assessment § 8003 would have said "tax" rather than "fee." We think this difference between § 8003's description and the district court's is inconsequential. The effect of § 8003 is the same as if it had used the word "tax." In *Heinszen,* Congress called the "tax" at issue there a "duty," yet the Supreme Court still found a valid ratification. 206 U.S. at 378, 381–82, 27 S.Ct. 742. In *Skinner v. Mid-America Pipeline Co.,* 490 U.S. 212, 214–15, 222–23, 109 S.Ct. 1726, 104 L.Ed.2d 250 (1989), the Court sustained Congress's delegation of its taxing power in a provision, entitled "Pipeline safety user fees," directing the Secretary of Transportation to establish a system of "user fees" to cover costs of administering federal pipeline safety programs. *See also Florida Power & Light Co. v. United States,* 846 F.2d 765, 769, 776 (D.C.Cir.1988). Here, although the district court found the Preservation Assessment to be a "tax," we are certain that § 8003 addresses the resulting fund of money collected for NSF's benefit between September 1995 and March 1998. Section 8003 identifies this case by name and by its district court docket number; it accurately describes the district court's holding; it specifies the precise period when the Preservation Assessment was collected; and it mirrors the language the district court used in suggesting ratification. The section's caption—"RATIFICATION OF INTERNET INTELLECTUAL INFRASTRUCTURE

8. Registrants have not appealed the district court's dismissal of their claims concerning the Administrative Procedure Act and Article IV, § 3 of the Constitution. At oral argument, they also withdrew their appeal of the district court's dismissal of their claim under § 1 of the Sherman Act. *See Kickapoo Tribe of Indians v. Babbitt,* 43 F.3d 1491, 1496 n. 7 (D.C.Cir.1995).

9. No party has drawn a distinction between congressional ratification before a judicial decision and ratification—as here—after a decision (but before a final judgment) declaring the agency action unlawful. *Cf. Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 219–25, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). We will therefore assume that the two situations should be treated the same.

FEE"—makes Congress's intent unmistakable, and the accompanying Conference report states that § 8003 "serve[s] to ratify and confirm Congressional intent with respect to the collection and use of funds by the National Science Foundation....and the language included in this new section will statutorily correct the lack of authority perceived by the court."[10] On the other hand, plaintiffs' reading of § 8003 renders the provision nonsensical. The district court had not held any "fee" illegal and so, if § 8003 ratified only user fees, it ratified nothing.

Registrants cannot, as they suppose, derive support for their interpretation of § 8003 from the Internet Tax Freedom Act, Title XI of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub.L. No. 105–277, 112 Stat. 2681 (1998). The Internet Tax Freedom Act became law after the district court's dismissal of this case; it does not repeal § 8003; in fact it does not even mention § 8003; the tax moratorium it enacts deals with prospective taxes imposed by states or political subdivisions thereof; it excludes from its coverage "liability for taxes accrued and enforced before the date of enactment of this Act"; and it specifically exempts "ongoing litigation relating to such taxes."

■ This brings us to the second question raised in light of *Heinszen*—whether Congress could have authorized NSF to collect the assessment from the beginning (if it could not have done so, it cannot ratify NSF's actions after the fact). Registrants start this part of their argument with the proposition that "Congress can never delegate the unfettered power to legislate," from which they conclude that Congress could not have delegated to NSF

the power "to fix Internet taxes" before the 30 percent assessment went into effect. Appellants' Brief at 23–24. We think registrants' argument miscasts not only what Congress did, but also what Congress could have done initially. Section 8003 delegated to NSF no discretionary authority, much less the power to enact tax legislation or to fix tax rates. When Congress passed this provision in May 1998, the rate had already been set, the assessments already collected. Congress then knew how much Network Solutions had been charging registrants, the period during which the charges had been imposed (September 14, 1995, through March 31, 1998), and what portion of the charges—30 percent— had gone to NSF and for what purpose. It was this "fee" that, in the words of § 8003, Congress "legalized and ratified and confirmed as fully to all intents and purposes as if the same had, by prior act of Congress, been specifically authorized and directed." If a prior act of Congress had directed NSF to collect $30 for each new registration and $15 thereafter and to retain the funds in order to support the Internet, we perceive no reason—registrants have offered none—why such legislation would not have been within Congress's constitutional power under Article I, § 8. *See Federal Power Comm'n v. New England Power Co.*, 415 U.S. 345, 349, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974); *Seafarers Int'l Union of N. Am. v. United States Coast Guard*, 81 F.3d 179, 182–83 (D.C.Cir.1996).

### III

Count 10 of the amended complaint charges that Network Solutions, in violation of § 2 of the Sherman Act, 15 U.S.C., abused its alleged monopoly power in the

---

**10.** Registrants also make much of a letter from a Member of the House of Representatives and a letter from three Senators written after Congress passed § 8003. Such isolated post-enactment statements, to the extent that they are legislative *history*, carry little weight, *see Landgraf v. USI Film Products*, 511 U.S. 244, 262, 262–63 n. 15, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and in any event, do not alter the plain meaning of this statute. It is clear that Congress meant to ratify the Preservation Assessment. Even these legislators do not appear to contest this. All they dispute is the Preservation Assessment's label—tax or fee.

domain name registration market by refusing to allow potential competitors to introduce additional top-level domains into the "Configuration File"—the "A" root server—"the Essential Facility controlled by [Network Solutions]."[11] The district court dismissed this claim for failure to state a cause of action, on the ground that a "federal instrumentality doctrine" gave Network Solutions the same immunity from antitrust liability as that enjoyed by NSF.

■ Whether there is, or should be, any such "federal instrumentality doctrine" in this context is not clearly settled. The Department of Justice, representing NSF in this appeal, has taken no position on the question. Network Solutions, seeking to convince us of its immunity, starts with the point that NSF is itself outside the reach of the Sherman Act. This is clear enough. NSF is part of the federal government. The Supreme Court has interpreted the word "person" in § 2 of the Sherman Act to exclude the United States from liability. *See United States v. Cooper Corp.*, 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941). We therefore held in *Sea–Land Service, Inc. v. Alaska Railroad*, 659 F.2d 243 (D.C.Cir.1981), that the Alaska Railroad, an entity wholly owned and operated by the federal government, was not subject to Sherman Act liability. Given NSF's antitrust immunity, Network Solutions maintains that it also has immunity so long as its alleged anti-competitive actions were "taken pursuant to the Cooperative Agreement." Network Solutions' Brief at 34. In agreeing with this conclusion, the district court relied on *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 58–65, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). But as Network Solutions now acknowledges, *Southern Motor Carriers* arose in a different setting. The Supreme Court was there interpreting the effect of *Parker v. Brown*, 317 U.S. 341, 352, 63 S.Ct. 307, 87 L.Ed. 315 (1943), which recognized the immunity of States under the Sherman Act for imposing a restraint on trade "as an act of government." As to entities under State regulation, *Southern Motor Carriers* held that if they take action pursuant to a "clearly articulated and affirmatively expressed" State policy, even a policy simply permitting the anticompetitive conduct, and if the State actively supervises the conduct, such private parties are also immune from antitrust liability. 471 U.S. at 62, 105 S.Ct. 1721. The Court's reasoning rested, in part, on considerations of federalism, considerations obviously not present when federal regulation is involved. *See id.* at 61, 105 S.Ct. 1721; *compare Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 300–01, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973), *with* 1A PHILLIP E. AREEDA & HERBERT HOVENCAMP, ANTITRUST LAWS § 248, at 116–18 (1997 ed.).

Just as important, *Southern Motor Carriers* dealt only with state *regulation* of private entities. *See also Greensboro Lumber Co. v. Georgia Power Co.*, 844 F.2d 1538 (11th Cir.1988). Here we have instead a contractual relationship between a federal government agency and a private party.[12] It is not obvious to us, particularly in view of *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), *reh'g denied*, 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 201 (1973), that a private contractor automatically shares the federal agency's immunity

---

11. Count 10 might be read to allege another, distinct claim—namely, that Network Solutions denied access to the Configuration File to some unnamed potential competitors purportedly seeking to register domain names containing the customary top level domains. At oral argument registrants seemed to eschew such a reading. In any event, our treatment of Count 10 applies equally to this potentially distinct claim.

12. The complex subject of antitrust immunity for private parties, after the Supreme Court's decision in *Parker v. Brown*, is discussed at length in 1 PHILLIP E. AREEDA & HERBERT HOVENCAMP, ANTITRUST LAWS §§ 221–231, at 356–540 (revised ed.1997).

simply because the contractor's allegedly anti-competitive conduct occurred—as Network Solutions puts it and some courts suggest[13]—"pursuant" to a government contract. A contractor might be free to perform the contract in any number of ways, only one of which is anticompetitive.[14]

■■■ Whether and under what circum-· stances a federal contractor has antitrust immunity are questions we leave to another day. A firmer ground for resolving this aspect of the case is presented; although it was neither raised nor decided in the district court, it has been argued on appeal and prudence dictates that we consider it. Count 10 of the complaint states, as the registrants agree, an "essential facilities" claim. *See generally* 3A PHILLIP E. AREEDA & HERBERT HOVENCAMP, ANTITRUST LAWS §§ 771–774, at 172–228 (1996); PHILLIP E. AREEDA & HERBERT HOVENCAMP, ANTITRUST LAWS 654–60 (1995 Supp.). Network Solutions, for the first time on appeal, contends that plaintiffs lack "standing" to raise their "essential facilities" claim. *Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080, 1088 (D.C.Cir.1998), decided after the district court's decision in this case, held that among the "elements of an antitrust claim for denial of access to an essential facility are (1) a monopolist who competes with the plaintiff controls an essential facility" and "(3) the monopolist denied the plaintiffs use of the facility. . . ." The plaintiffs here are those who registered their domain names for a fee. They are not, according to their amended complaint, competitors of Network Solutions. It follows that they have failed to satisfy two of the elements set forth in *Caribbean Broadcasting.* Does this mean they lack "antitrust standing," *see Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), as Network Solutions claims, or does it mean that they have failed to state a cause of action? Our decision in *Caribbean Broadcasting* holds that competitor status is simply an element of the cause of action, in the absence of which the claim should be dismissed under Rule 12(b)(6), FED. R. CIV. P. *See* 148 F.3d at 1089. While this does not necessarily preclude also treating the matter in terms of standing,[15] and thus as a question that may be raised at any time, we have determined to rely on *Caribbean Broadcasting* and its treatment of non-competitor status even if we are dealing not with standing but with a defense on the merits. As we have said, *Caribbean Broadcasting* came down after the decision below. If we ignored *Caribbean Broadcasting* and sent the case back to

13. *See, e.g., PGMedia, Inc.,* No. 97 Civ. 1946 RPP, slip op. at 20; *Beverly v. Network Solutions, Inc.,* No. C–98–0337–VRW, 1998 WL 320829, at *4 (N.D. Cal. June 12, 1998); *Medical Ass'n of Ala. v. Schweiker,* 554 F.Supp. 955, 966 (M.D.Ala.1983).

14. In *Otter Tail,* an electric utility company sought to avoid Sherman Act liability partly on the ground that its anti-competitive actions were pursuant to its contract with the Bureau of Reclamation, a federal agency. The Court rejected this defense, agreeing with the Solicitor General that "government contracting officers do not have the power to grant immunity from the Sherman Act." 410 U.S. at 378–79, 93 S.Ct. 1022. To this firm statement, the Court added what might be perceived as qualifiers:

> Such contracts stand on their own footing and are valid or not, depending on the statutory framework within which the fed-

eral agency operates. The Solicitor General tells us that these restrictive provisions [in the contract] operate as a "hindrance" to the Bureau and were "agreed to by the Bureau only at Otter Tail's insistence," as the District Court found. The evidence supports that finding.

*Id.* at 379, 93 S.Ct. 1022.

15. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 1013 n. 2, 140 L.Ed.2d 210 (1998): "The question whether this plaintiff has a cause of action under the statute, and the question whether any plaintiff has a cause of action under the statute are closely connected—indeed, depending upon the asserted basis for lack of statutory standing, they are sometimes identical, so that it would be exceedingly artificial to draw a distinction between the two."

the district court, either because we disagreed with the district court's finding of immunity, or because we thought further factual development was in order, *see Otter Tail Power Co.,* 410 U.S. at 379, 93 S.Ct. 1022, Network Solutions would be free to invoke *Caribbean Broadcasting* in its answer, which it has not yet filed, or in a motion for summary judgment, or both. The district court would then have to rule in favor of Network Solutions ·because the plaintiffs are not competitors. There is no reason to postpone the inevitable. In these rather exceptional circumstances we have discretion to consider a claim neither raised nor decided in the district court. *See Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 38–39, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989); *Heckler v. Campbell,* 461 U.S. 458, 468–69 n. 12, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); *Animal Legal Defense Fund v. Espy,* 23 F.3d 496, 499 (D.C.Cir. 1994). On the basis of *Caribbean Broadcasting* we therefore will affirm the district court's judgment dismissing Count 10.

## IV

■ The final issue deals with the Independent Offices Appropriation Act ("Act"), 31 U.S.C. § 9701, a statute requiring that fees charged for federal agency services comport with set criteria.[16] Registrants claim that the above-cost portion of the fees Network Solutions charged for its registration and renewal services violated the Act.

Government agencies cannot escape responsibility for failing to perform their statutory duties by hiring private parties to perform those duties. If a statute required NSF to register domain names, and NSF farmed this out to Network Solutions, the Act might apply. But that is not the situation before us. The key governing statute is 42 U.S.C. § 1862(g). While § 1862(g) may, or may not, permit NSF to register and renew domain names—we do not need to reach this question—we are certain that it does not require NSF to do so. It merely directs NSF "to foster and support access ... to computer networks." 42 U.S.C. § 1862(g). One way to fulfill such a broad mandate, NSF apparently decided, was to enter into a cooperative agreement with Network Solutions to have the company register and maintain second-level domain names.

Registrants argue that because a federal agency hired Network Solutions, the Act must cover the domain name fees. By its terms, the Act applies only to "a service or thing of value *provided by an agency.*" 31 U.S.C. § 9701(a) (emphasis added). Here, a private party (Network Solutions) performed the domain name registration services—and did so as it saw fit. Registrants' amended complaint acknowledges Network Solutions' near total command over domain name registrations: "NSF has not and does not directly supervise or manage any NSI activities pertaining to the Domain Name registration process. The only 'control' and 'oversight' exercised

---

**16.** Section 9701 states in full:

Fees and charges for Government services and things of value[:]

(a) It is the sense of Congress that each service or thing of value provided by an agency (except a mixed-ownership Government corporation) to a person (except a person on official business of the United States Government) is to be self-sustaining to the extent possible.

(b) The head of each agency (except a mixed-ownership Government corporation) may prescribe regulations establishing the charge for a service or thing of value provided by the agency. Regulations prescribed by the heads of executive agencies are subject to policies prescribed by the President and shall be as uniform as practicable. Each charge shall be—(1) fair; and (2) based on—(A) the costs to the Government; (B) the value of the service or thing to the recipient; (C) public policy or interest served; and (D) other relevant facts.

(c) This section does not affect a law of the United States—(1) prohibiting the determination and collection of charges and the disposition of those charges; and (2) prescribing bases for determining charges, but a charge may be redetermined under this section consistent with the prescribed bases.

by NSF over NSI and the Domain Name registration process is the contractual requirement that NSF submit certain limited quarterly and annual reports."[17] This might seem sufficient to indicate that the Act does not apply. But if we give the section a broader interpretation, see *Ayuda, Inc. v. Attorney General*, 848 F.2d 1297, 1299–1300 (D.C.Cir.1988), the question becomes whether domain name registration is a *government* service or thing of value within the Act's meaning. The answer, we believe, is no. As we said, Congress chose not to require NSF or any other agency of the federal government to register domain names. Simply because NSF might have been able to perform domain name registration does not transform this activity into a *government* service or thing of value. A recent and novel function such as domain name registration hardly strikes us as a "quintessential" government service, as registrants suppose.[18] Indeed, it was not the government but the Internet Assigned Numbers Authority— headed by the late Dr. Postel at USC, see 63 Fed.Reg. at 8826—that originally maintained host computer name lists.

The two Comptroller General decisions registrants cite do not alter this conclusion. In *In re: FEC–Sales of Microfilm Copies of Candidate and Committee Reports*, 61 Comp. Gen. 285 (1982), and *In re: Retention of Fees Received by EPA Contractors Providing Information Services to the Public*, 1975 WL 7967 (Comp. Gen. Oct. 20, 1975), federal agencies hired private firms to produce agency records on the agencies' behalf. Both cases involved services that statutes required the agencies to perform. There is no such statutory mandate here.

17. Registrants' admission that Network Solutions—not NSF—controlled the domain name registration process negates registrants' claim that Network Solutions was merely NSF's agent.

18. Registrants also stress the "public purpose" of domain name registration. But as the Supreme Court has said, albeit in a slight-

The Act is a nonfit in other ways. The Act applies to monies bound for the federal treasury. In its original form, the Act stated that "any amount" from fees or charges for government services "shall be collected and paid into the Treasury" as miscellaneous receipts. Pub.L. No. 137, tit. V, 65 Stat. 268, 290, formerly codified at 31 U.S.C. § 483a, recodified at 31 U.S.C. § 9701. The 1982 recodification of the Act omitted this requirement but only because § 3302(a) made it "unnecessary." 31 U.S.C. § 9701, Explanatory Notes. Section 3302 provides that any official or agent who receives money for the government from any source shall keep the money safe, see § 3302(a), and deposit the money in the Treasury, see § 3302(b). The monies at issue here—the 70 percent portion of the domain name fees—were paid to Network Solutions for its services. The company is under no duty to turn over any portion to the federal government. To the contrary, according to the cooperative agreement and federal law, see 58 Fed. Reg. 62,992, 62,995, 62,998 (1993), as amended by 62 Fed.Reg. 45,934 (1997), the monies belong to Network Solutions. Any remaining doubt is laid to rest by considering the penalty for noncompliance with § 3302. An official or agent who receives money for the government and does not deposit such money promptly in the Treasury may be removed from office. See id. § 3302(d). This sanction makes no sense with respect to a private actor like Network Solutions.

For all these reasons we hold that the Independent Offices Appropriation Act does not cover the fees Network Solutions charged for its services.

\* \* \*

ly different context: "[T]hat a private party performs a function which serves the public does not make its acts governmental." *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 543–44, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (citation omitted).

We have considered and rejected registrants' other contentions.

*Affirmed.*