RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0166p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TIGER LILY, LLC, et al.,

        *Plaintiff-Appellees*,

   v.

UNITED STATES DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, et al.,

        *Defendants-Appellants*.

No. 21-5256

───────────────

On Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:20-cv-02692—Mark S. Norris Sr., District Judge.

Decided and Filed:  July 23, 2021

Before:  NORRIS, THAPAR, and BUSH, Circuit Judges.

───────────────

## COUNSEL

ON BRIEF: Alisa B. Klein, Brian J. Springer, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellants.  S. Joshua Kahane, Aubrey B. Greer, GLANKLER
BROWN, PLLC, Memphis, Tennessee, for Appellees.  Brianne J. Gorod, CONSTITUTIONAL
ACCOUNTABILITY CENTER, Washington, D.C., Jay R. Carson, THE BUCKEYE
INSTITUTE, Columbus, Ohio, for Amici Curiae.

     BUSH, J., delivered the opinion of the court in which NORRIS and THAPAR, JJ.,
joined.  THAPAR, J. (pp. 10–13), delivered a separate concurring opinion.

───────────────

## OPINION

───────────────

     JOHN K. BUSH, Circuit Judge.  Ten months ago, the Centers for Disease Control and
Prevention imposed an eviction moratorium on rental properties across the country.  It found

authority for its unprecedented action in a provision of the Public Health Service Act of 1944. Plaintiffs sued, arguing that the provision does not grant the CDC the sweeping authority it claims. The district court found in their favor and granted them declaratory relief. We affirm.

I.

In March of 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act. Pub. L. No. 116-136, 134 Stat. 281 (2020). Among other things, the CARES Act imposed a 120-day moratorium on evictions from rental properties that participated in federal assistance programs or had federally backed loans. *Id.* § 4024.

After that congressionally enacted moratorium ended, the CDC stepped in. It issued an order entitled "Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19." 85 Fed. Reg. 55,292. The Halt Order imposed a broader eviction moratorium than Congress had, one that prohibited eviction of all "covered persons"—without regard to whether the rental property relied on federal funds or loans—through December 31, 2020. *Id.* The CDC explained that the Order is a necessary measure to facilitate self-isolation, support state lockdown orders, and prevent congregation in settings like homeless shelters. *Id.* at 55,294.

The CDC found authority for its entry into the landlord-tenant relationship in the Public Health Service Act of 1944, which authorizes the Secretary of Health and Human Services[1] to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). To carry out and enforce "such regulations," the Secretary can "provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.*

In late December, before the Halt Order elapsed, Congress included a provision in the Consolidated Appropriations Act that extended the order through January 31, 2021. Pub. L. No. 116-260, § 502, 134 Stat. 1182 (2020). Since then, the CDC has thrice extended the order

---

[1]The statute actually grants the authority to the Surgeon General, but it has since been transferred to the Secretary. 20 U.S.C. § 3508; 31 Fed. Reg. 8855.

beyond that congressionally authorized date—first until March 31, then until June 30, and now through July 31.  86 Fed. Reg. 8020; 86 Fed. Reg. 16,731; 86 Fed. Reg. 34,010.

Soon after the CDC issued the original Halt Order, Plaintiffs, who own or manage rental properties, filed suit seeking a declaratory judgment that the Halt Order exceeds the government's statutory grant of power, that it violates the Constitution, and that its promulgation violated the Administrative Procedures Act.  They also sought a preliminary injunction barring the order's enforcement.

The district court denied the preliminary-injunction motion because it found that Plaintiffs' loss of income did not rise to the level of an irreparable injury.  The government then moved for judgment on the pleadings, and Plaintiffs for judgment on the administrative record.  The district court ruled for Plaintiffs, finding that the Halt Order exceeded the government's statutory authority under 42 U.S.C. § 264(a).  *Tiger Lily v. U.S. Dep't of Hous. & Urb. Dev.*, No: 2:20-cv-02692-MSN-atc, 2021 WL 1171887, *10 (W.D. Tenn. Mar. 15, 2021).  The next day, the government appealed and moved in both the district court and our court for an emergency stay pending appeal.  We denied the motion because the government was not likely to succeed on the merits.  *See Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 992 F.3d 518, 522–23 (6th Cir. 2021).  We now address the merits.

II.

On appeal, the government argues only that the district court erred in declaring the CDC's Halt order an unlawful exercise of the agency's authority.  We review that question of law de novo.  *M.L. Johnson Fam. Properties, LLC v. Bernhardt*, 924 F.3d 842, 848 (6th Cir. 2019); *see also* 5 U.S.C. § 706(2).  Notably, the government does not ask us to grant *Chevron* deference to its interpretation of the relevant statute.  "We therefore decline to consider whether any deference might be due" the Halt Order.  *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021); *see also CFTC v. Erskine*, 512 F.3d 309, 314 (6th Cir. 2008).

III.

The government claims that the Public Health Act of 1944, 42 U.S.C. § 264(a), authorizes the CDC's Halt Order. Section 264(a) reads:

> The Surgeon General, with the approval of the Secretary, is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

That text does not grant the CDC the power it claims.

The first sentence authorizes the HHS Secretary "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). Following the D.C. Circuit's interpretation of § 264(a), the government argues that that text alone authorizes the CDC's order. *See Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.* (*AAR*), No. 21-5093, 2021 WL 2221646, at *1–2 (D.C. Cir. June 2, 2021). We agree that the first sentence grants the Secretary rulemaking authority. But that authority is not as capacious as the government contends.

When we interpret statutes, we must give effect to each clause and word. *See, e.g.*, *Loughrin v. United States*, 573 U.S. 351, 358 (2014). So in determining what authority Congress statutorily delegated to an agency, we look "not only [to] the ultimate purposes Congress has selected, but [to] the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994).

Here, those principles require us to interpret the scope of the grant of rulemaking authority in the first sentence of § 264(a) by reference to the means it authorizes in the second. Again, that second sentence details: "For purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as

to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." 42 U.S.C. § 264(a).  Read in conjunction with the first sentence, the second lists how the Secretary might enforce the regulations that are, in his judgment, "necessary to prevent the introduction, transmission, or spread of communicable diseases." *Id.*  Plainly, the second sentence narrows the scope of the first. *See Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, No. 20-14210, 2021 WL 2944379, at \*2 (11th Cir. July 14, 2021) (reasoning that the second sentence in § 264(a) "clarif[ies] any ambiguity about the scope of the CDC's power under the first.").  And the CDC is "bound" by those means that Congress has deemed "appropriate" and has "prescribed." *MCI*, 512 U.S. at 231 n.4 (1994); *see also Merck & Co. v. United States Dep't of Health & Hum. Servs.*, 962 F.3d 531, 536 (D.C. Cir. 2020).

The government contends that the second sentence does not circumscribe the power granted in the first, but instead expands on it.  It reasons, again parroting the D.C. Circuit's analysis in *AAR*, that Congress penned the second sentence because it had reason to believe in 1944 that the measures listed required explicit authorization given that they might raise Fourth Amendment concerns.  For support, it cites *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 (1946).

In *Oklahoma Press*, the Court cited *FTC v. American Tobacco Co.*'s instruction that absent "the most explicit language," courts should not read statutes as authorizing agencies to "sweep" constitutional traditions "into the fire." 327 U.S. at 201 & n.26 (quoting *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 305–06 (1924)).  Both cases simply articulate the well-settled rule that courts "should never . . . construe an Act in a sense which would render it unconstitutional if a different and permissible construction will save it." *Addison v. Holly Hill Co.*, 322 U.S. 607, 623 (1944).  Neither supports the government's attempt to explain away the second sentence of § 264(a).[2]

---

[2]Additionally, *Oklahoma Press* was decided in 1946, two years after the Public Health Act of 1944, and *American Tobacco* involved a regulatory demand for corporate documents. *See Oklahoma Press*, 327 U.S. at 186; *American Tobacco* Co., 364 U.S. at 305–06.  Neither case placed Congress on notice that giving the Secretary authority to order inspections and fumigations would implicate the Fourth Amendment, and thus require some explicit text.

Shorn of its *Oklahoma Press* explanation, the government's reading reduces the other provisions in § 264 to mere surplusage. *See Yates v. United States*, 574 U.S. 528, 543 (2015). If the first sentence really did grant the Secretary plenary authority to impose any regulation he thought "necessary to prevent the introduction, transmission, or spread of communicable diseases," there would be no need to specifically authorize the apprehension and detention of infected individuals in § 264(d), or the inspection and fumigation of contaminated properties in § 264(a). Those specific grants of power would be superfluous. We will not adopt such an interpretation where a more reasonable one exists. *See Yates*, 574 U.S. at 543.

This approach also accords with the expectation that Congress would "speak clearly if it wish[ed] to assign to an agency decisions of vast economic and political significance," like the decision to shut down evictions across the entire country. *Utility Air Regul. Grp. v. EPA.*, 573 U.S. 302, 324 (2014) (plurality opinion) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). There is no clear expression of congressional intent in § 264 to convey such an expansive grant of agency power, and we will not infer one. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes."); *see also Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2320 (2021) (Kavanaugh, J., concurring) (citing the major-questions doctrine in determining that the CDC "exceeded its existing statutory authority by issuing a nationwide eviction moratorium").

Therefore, we conclude that the first sentence of § 264(a) authorizes the Secretary to take action and the second dictates what actions he may take. That means that if the CDC has the authority to impose a nationwide eviction moratorium, it must come from the second sentence of § 264(a). The government does not argue that it does, so we need not belabor the point. We adhere to our prior reasoning. *See Tiger Lily*, 992 F.3d at 522–23. Applying the *ejusdem generis* canon of statutory construction, the residual phrase in the second sentence of § 264(a)—which allows the Secretary to take "other measures" he deems necessary to stop the spread of disease— encompasses measures that are similar to inspection, fumigation, destruction of animals, and the like. *Id.* Plainly, an eviction moratorium does not fit that mold. *Id.*

What's more, even if we construed the phrase "other measures" more expansively, we cannot read § 264(a) to grant the CDC the power to insert itself into the landlord-tenant relationship without clear textual evidence of Congress's intent to do so. *Id.* at 523. Our reading of the statute's text accords with the principle that "Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001). That principle has yet greater force when "the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power," *id.* at 173, like landlord-tenant relations, *see Lindsey v. Normet*, 405 U.S. 56, 68 (1972) ("The Constitution has not federalized the substantive law of landlord-tenant relations."). Agencies cannot discover in a broadly worded statute authority to supersede state landlord-tenant law. Instead, Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–1850 (2020). The absence of any such clarity in § 264(a) indicates that the CDC cannot nationalize landlord-tenant law.

Finally, to put "extra icing on a cake already frosted," the government's interpretation of § 264(a) could raise a nondelegation problem. *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021) (quoting *Yates v. United States*, 574 U.S. 528, 557 (2015) (Kagan, J., dissenting)). Under that interpretation, the CDC can do anything it can conceive of to prevent the spread of disease. That reading would grant the CDC director near-dictatorial power for the duration of the pandemic, with authority to shut down entire industries as freely as she could ban evictions. *See Florida v. Becerra*, No. 821-839-SDM-AAS, 2021 WL 2514138, *29–31 (M.D. Fla. June 18, 2021) (discussing the possible actions the government could take under its interpretation). In applying the nondelegation doctrine, the "degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Am. Trucking*, 531 U.S. at 475. Such unfettered power would likely require greater guidance than "such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases." *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645–46 (1980) (plurality opinion) ("[I]t is unreasonable to assume that Congress intended to give the Secretary the unprecedented power over American industry that would result from the

Government's view . . . . A construction of the statute that avoids this kind of open-ended grant should certainly be favored.").

## IV.

The government argues that even if the CDC initially lacked the power to impose the eviction moratorium, that changed in December 2021 when Congress passed the appropriations act that contained a provision extending the expiration date of the CDC's Halt Order. That provision reads:

> The order issued by the Centers for Disease Control and Prevention under section 361 of the Public Health Service Act (42 U.S.C. 264), entitled "Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID–19" (85 Fed. Reg. 55292 (September 4, 2020) is extended through January 31, 2021, notwithstanding the effective dates specified in such Order.

Pub. L. No. 116-260, § 502. The government's interpretation is incorrect. The provision is better understood to give force to the moratorium for the period it covers, not to alter the CDC's power beyond that period.

There are two possible understandings of what the extension provision means. The first is that, as the government argues, it constitutes Congress's acquiescence in the agency's assertion of power. But we recognize congressional acquiescence to an agency's interpretation only "with extreme care." *Solid Waste Agency*, 531 U.S. at 169. The second possibility is that Congress ratified the moratorium for the period from September 4, 2020 through January 31, 2021, giving "the force of law to official action unauthorized when taken." *Swayne & Hoyt v. United States*, 300 U.S. 297, 302 (1937). Especially in light of the high bar to prove the former, the latter is the better understanding here.

The government's argument is premised on the notion that when Congress goes along with an agency's interpretation of a statute, courts can assume that it agrees with the agency. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 600–01 (1983). Here, the government says, Congress did not just go along; it enacted a statute explicitly approving of the CDC's interpretation. If that were the case, then it would "amount to a legislative declaration of . . . meaning" that would "govern the construction of the first statute." *Branch v. Smith*, 538 U.S.

254, 281 (2003) (plurality opinion) (quoting *United States v. Freeman*, 44 U.S. (3 How.) 556, 565 (1845)).   But, again, we must exercise "extreme care" in determining that Congress has authoritatively agreed with an agency's interpretation of a statute.  *See Solid Waste Agency*, 531 U.S. at 169.  That is all the more true where, as discussed above, the agency's interpretation is both textually implausible and constitutionally dubious.

Instead of granting an agency new power, Congress can give force to particular agency actions that were originally unlawful.  "An old Supreme Court case—rarely cited but never overruled—stands for the proposition that Congress 'has the power to ratify the acts which it might have authorized' in the first place, so long as the ratification 'does not interfere with intervening rights.'"  *Thomas v. Network Sols., Inc.*, 176 F.3d 500, 506 (D.C. Cir. 1999) (quoting *United States v. Heinszen & Co.*, 206 U.S. 370, 384 (1907)).  In *Thomas*, the D.C. Circuit applied that principle when Congress, responding to a district court decision holding an agency action unlawful, passed a statute that made the action lawful "as if the same had, by prior act of Congress, been specifically authorized and directed."  *Id.* at 505.  There, the ratification was wholly retrospective, addressing the exact period for which litigants sought relief.  *Id.*  Here, by contrast, Congress gave force to the otherwise-unlawful order both retrospectively and prospectively, blessing it for the period from September 4 to January 31.  But that ratification did not purport to alter the meaning of § 264(a), so it did not grant the CDC the power to extend the order further than Congress had authorized.

V.

For those reasons, we conclude that 42 U.S.C. § 264(a) does not authorize the CDC to implement a nationwide eviction moratorium.**[3]**  We therefore affirm.

---

**[3]**Because we reach that conclusion, we need not address Plaintiffs' myriad other arguments in favor of affirmance.

---

**CONCURRENCE**

---

THAPAR, Circuit Judge, concurring.  If the separation of powers meant anything to our framers, it meant that the three necessary ingredients to deprive a person of liberty or property—the power to make rules, to enforce them, and to judge their violations—could never fall into the same hands.  For that reason, our Founders did not just "split the atom of sovereignty" by dividing powers between the Federal Government and the States.  *Alden v. Maine*, 527 U.S. 706, 751 (1999) (cleaned up).  They also separated powers *within* the Federal Government:  The legislative power went to Congress; the executive to the president; and the judicial to the courts.  That is the equilibrium the Constitution demands.  And when one branch impermissibly delegates its powers to another, that balance is broken.

Of the three branches, Congress is the most responsive to the will of the people.  And the Founders designed it that way for a reason:  Congress wields the formidable power of "prescrib[ing] the rules by which the duties and rights of every citizen are to be regulated."  The Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  If legislators misused this power, the people could respond, and respond swiftly.

So, naturally, Congress has an incentive to insulate itself from the consequences of hard choices.  That was clear from the start.  Consider one prominent example.  The Constitution empowers Congress "[t]o establish Post Offices and post Roads."  U.S. Const. art. I, § 8, cl. 7.  For 18th-century Americans, this was high-stakes stuff.  A federal post road could change a town's fortunes overnight, so debates over their placement captured the national attention.  When the Second Congress debated an early bill laying out a detailed plan for post roads running from Maine to Georgia, one Congress introduced an amendment "to strike the enumerated routes and replace them with the provision 'by such route as the President of the United States shall, from time to time, cause to be established.'"  Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490, 1506 (2021).  In other words, the amendment promised to transfer this set of hard choices from Congress to the executive branch.

It was a clever dodge, but it didn't work.  Congress rejected the proposal after several prominent Congressmen raised a nondelegation challenge.  *See id.* at 1506–12.  James Madison was representative when he argued that this proposal to "*alienat[e]* the powers of the House . . . would be a violation of the Constitution."  *Id.* at 1507.

Madison was right.  The constitutional design is frustrated if "Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals."  *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting).  By shifting responsibility to a less accountable branch, Congress protects itself from political censure—and deprives the people of the say the framers intended them to have.

And yet, over the years, the guardrails have crumbled.  *See, e.g.*, *Dep't. of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 77 (2015) (Thomas, J., concurring in judgment) (noting that the Court's test for enforcing the nondelegation doctrine "largely abdicates our duty to enforce that prohibition").  Thus, the Supreme Court should consider breathing new life into the doctrine.

But one common critique stands in the way:  Congress simply isn't up to the job.  According to some, Congress is incapable of acting quickly in response to emergencies.  Others say modern society is too complex to be run by legislators—better to leave it to the agency bureaucrats.  In light of the original meaning, history, and structure of our Constitution, these arguments should not carry any weight.  But even on their own terms, neither argument washes.

Start with concerns that Congress cannot act fast enough in a crisis.  The government's response to the coronavirus pandemic proves otherwise.  Congress acted swiftly to pass broad relief for the general public.  But it also switched out the hammer for the scalpel when necessary.

Take student veterans as an example.  As the pandemic tore through the country, universities abruptly moved their lessons online.  Under a Department of Veterans Affairs regulation, student veterans faced the specter of losing their housing stipends under the G.I. Bill if they stopped attending in-person classes.  *See* 38 C.F.R. § 21.9640(b)(1)(ii).  The VA could have changed that regulation through the Administrative Procedure Act's emergency rulemaking provision.  *See* 5 U.S.C. § 553(b)(3)(B), (d)(3).  But Congress beat the administrative state to the punch.  On March 21, 2020, just two days after California announced the country's first

statewide stay-at-home order, Congress passed Public Law 116-128 to temporarily override the VA regulation and prevent any disruption in veterans' educational benefits.

The contention that Congress lacks the expertise to legislate on complicated topics appears similarly attractive at first glance. But the executive branch need not have a monopoly on experts. For example, Congress manages to pass tax legislation and annual budgets without outsourcing the job to the administrative agencies. If you took the critics of the nondelegation doctrine seriously, you might think that only the administrative state could predict how these laws would affect our nation's long-term fiscal health. But Congress has famously maintained a strong grip on these issues.

How? It has experts of its own. Professors Cross and Gluck have meticulously documented how nonpartisan structures like the Congressional Budget Office and the Joint Committee on Taxation—which are housed under Article I and ultimately accountable to Congress's leadership—have provided Congress with "technical expertise" that "safeguards the legislative process from executive and interest-group encroachment." Jesse M. Cross & Abbe R. Gluck, *The Congressional Bureaucracy*, 168 U. Pa. L. Rev. 1541, 1544 (2020). If Congress can manage the world-class economists at the CBO, then there's no reason to think it could not "meaningfully reassert itself as the top-line decision-maker on [other] important matters pertaining to our administrative state." Philip Wallach & Kevin R. Kosar, *The Case for a Congressional Regulation Office*, 48 Nat'l Affs. (Fall 2016). A strong nondelegation doctrine could compel Congress to strengthen its roster of expert institutions.

What's the difference between executive-branch experts and congressional ones? Executive-branch experts make regulations; congressional experts make recommendations. Congressional bureaucracy leaves the law-making power with the people's representatives— right where the Founders put it. Regardless of who came up with the idea, "[t]he sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow." *Gundy*, 139 S. Ct. at 2134 (Gorsuch, J., dissenting).

This case proves the point. As is often true, there are two sides to today's story. *Compare* Matthew Haag, *A Landlord Says Her Tenants Are Terrorizing Her. She Can't Evict*

*Them*, N.Y. Times (July 9, 2021), *with Eviction Moratoriums Are Expiring, but Millions of Tenants Are Still Relying on Them*, N.Y. Times (June 16, 2021). It is not our job as judges to make legislative rules that favor one side or another. But nor should it be the job of bureaucrats embedded in the executive branch. While landlords and tenants likely disagree on much, there is one thing both deserve: for their problems to be resolved by their elected representatives.